IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| JOIYCE A. BELLAMY,[1] ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:03-CV-043 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claim for disability insurance benefits under Title II of the Social Security Act. For the reasons provided herein, defendant's motion for summary judgment [doc. 23] will be granted, and plaintiff's motion for summary judgment [doc. 20] will be denied. The final decision of the Commissioner will be affirmed.

---

[1] In her complaint [doc. 1], there exists a discrepancy in the spelling of plaintiff's first name. As is its practice, the court will employ in its caption the exact spelling employed by plaintiff in the caption of her complaint.

I.

*Procedural History*

The present application is the second in a series of three. The first, filed in February 1999, was denied on June 2, 1999, and not further appealed. [Tr. 19, 73, 91]. The third, filed in June 2002, was granted by the Commissioner effective February 9, 2001, apparently due to a purported suicide attempt by plaintiff. [Tr. 474]. Because of the *res judicata* effect of the first application's denial, the present appeal therefore pertains only to a closed period of alleged disability between June 3, 1999, and February 8, 2001.

Under the present application, plaintiff claims to be disabled by "depression, abdominal pain from several surgeries, [and] carpal tunnel syndrome." [Tr. 105]. Her claim was denied initially and on reconsideration. She then requested a hearing, which took place before an Administrative Law Judge ("ALJ") in January 2001. On February 8, 2001, the ALJ issued a decision denying benefits. He found plaintiff's allegations to be "not credible or supported by the documentary evidence." [Tr. 23]. Citing vocational expert testimony, the ALJ concluded that plaintiff retained the residual functional capacity ("RFC") to perform a significant number of light jobs existing in the regional and national economies. [Tr. 22]. Plaintiff was accordingly found ineligible for benefits.[2]

---

[2] The ALJ accurately noted that multiple examining sources had diagnosed alcohol dependence and/or opiate abuse. [Tr. 20]. Those diagnoses were consistent with plaintiff's admissions, such as "I drink till I'm out of it," to <u>four</u> different medical sources. [Tr. 329, 333, 359, 363-64]. At her administrative hearing, plaintiff acknowledged making such statements but then endeavored to "swear on the Bible" that she does not have a substance abuse problem. [Tr. 45-46].
(continued...)

Plaintiff then sought review from the Commissioner's Appeals Council. Review was denied on January 2, 2003. [Tr. 6]. Plaintiff then appealed to this court. Upon motion of the Commissioner, the Honorable United States District Judge Thomas Gray Hull remanded plaintiff's case with instructions that the Appeals Council "review the post-hearing evidence in order to determine whether the information warrants a change in the Commissioner's final decision[.]" [Doc. 12].[3] On November 28, 2005, the Appeals Council again denied the present claim, concluding that plaintiff "has been under a disability since February 9, 2001, and not prior thereto." [Tr. 465]. By order dated August 31, 2006, this court granted defendant's motion to reopen the case. [Doc. 16]. The parties have again briefed their respective positions, and the case is again ripe for the court's review.

---

[2](...continued)
The evidentiary section of the ALJ's opinion concluded with the following sentence: "While there is some evidence of alcohol and drug abuse in the record, there is no evidence that the claimant has work restrictions on this basis and she does not allege any restrictions related to this history." [Tr. 23]. The ruling makes no further reference to plaintiff's self-admitted substance abuse.

On approximately February 11, 2001, plaintiff received a copy of the ALJ's decision. [Tr. 427]. "Saddened" by the denial, plaintiff and her husband claim that she then consumed twenty Xanax pills and went to bed "with a carpet knife in her hand." [Tr. 427]. The Indian Path Pavilion discharge summary of plaintiff's subsequent hospitalization indicates that "she was very saddened by this news because in the report they claimed that she was dependent on alcohol *and this was not true*." [Tr. 427] (emphasis added). Although it is unclear from the record before this court, it would appear that plaintiff's third Social Security application was granted based on this alleged incident.

[3] The post-hearing evidence referred to by Judge Hull was the February 2001 Indian Path file. [Tr. 422-62].

## II.

*Background*

Plaintiff was born in 1953. [Tr. 34]. She has an eleventh grade education and a certified nurse's assistant certificate. [Tr. 34-35]. Plaintiff has previously worked in the health care and fast food industries. [Tr. 106]. From 1996 to 1998, she was a "patient and employee supervisor" for a home health care business. [Tr. 122].

Plaintiff stands five feet seven inches tall and weighs between 244 and 312 pounds. [Tr. 414]. She testified that she has "problems" standing or lifting more than two pounds due to complications from hernia surgery. [Tr. 48-50, 60].[4] She claims "trouble with my hands" secondary to carpal tunnel syndrome. [Tr. 40, 49]. Plaintiff also testified that she experiences disabling depression and "anxiety attacks." [Tr. 50-52]. Because Xanax usage allegedly renders her unable to stay awake during the day, plaintiff naps either "[m]ost of the time in the afternoon" or "all day." [Tr. 58-59].

Plaintiff is reportedly able to do only minimal shopping, driving, and housework. [Tr. 54-55, 136-37]. She states that she does not care for her personal needs because "I don't do it, I don't feel like it and therefore don't do it." [Tr. 143].

---

[4] These claims may be less than accurate. On May 22, 2000, plaintiff sought medical treatment for back pain secondary to "moving some furniture." [Tr. 415]. In January 2000, she reported "mov[ing] some heavy objects this weekend." [Tr. 201].

III.

*Relevant Medical Evidence*

A. Mental

Plaintiff was hospitalized at Indian Path Pavilion from January 26 through March 1, 1987, due to allegedly "taking an overdose of Librium" in order "to get a good night's sleep" secondary to marital strife. [Tr. 149, 151, 160]. She was diagnosed with "[m]ajor depression, single episode," although "mental functions including attention span, memory and abstract thinking [were] intact." [Tr. 159-60]. Plaintiff reported a history of depression, anxiety, and family discord. [Tr. 158]. Clinical psychologist Kenneth Carrico described her in part as "seek[ing] to ensure sympathy and continued support from family members through somatic and psychosexual complaints." [Tr. 153]. Personality testing "reflect[ed] a desperate need for attention to her problems, as she exaggerated her current situation." [Tr. 152].

Plaintiff received counseling at Frontier Health, Inc. beginning in August 1998. At her intake interview, she appeared "somewhat depressed" due to family and marital issues. [Tr. 315]. Plaintiff reported increasing depression the following month, citing both marital and employer stressors. [Tr. 313-14]. Her social worker, Jo Ann Cox, noted plaintiff's concern that "she lacks the education to enable her to get another job *that pays as well as she is being paid.*" [Tr. 314] (emphasis added). In November 1998, Dr. James Turnbull diagnosed major depression, recurrent. [Tr. 305]. In January and February 1999,

5

Dr. Turnbull continued to describe plaintiff as "very depressed." [Tr. 301, 303].

Plaintiff's husband, purportedly speaking at his wife's insistence, terminated her treatment relationship with Frontier Health in March 1999. [Tr. 317]. That same month, plaintiff began counseling with Holston Medical Group. At the intake interview, social worker Gary Masters diagnosed anxiety and recurrent episodes of major depression. [Tr. 322-23]. Sporadic counseling notes through July 1999 - although virtually illegible - describe plaintiff as depressed, "passive aggressive," and "very much in victim role." [Tr. 319].

Clinical psychologist Wayne Lanthorn and examiner Donna Abbott performed a mental consultative examination in May 1999. Plaintiff "talked excessively, and when initially asked about her presenting symptoms, she spoke for 30 minutes without stopping. In general, she was [] overly dramatic." [Tr. 332]. Plaintiff

> indicated that she had been drinking since October of 1998 but denied regular alcohol usage prior to that time . . . . Now she drinks three to four times a week and said "I drink till I'm out of it." . . . When asked about drug usage she said "The only problem I have is [L]ortabs. Sometimes I take more than I should."

[Tr. 333-34]. The examiners diagnosed opioid abuse, depression, adjustment disorder, alcohol dependence, and histrionic personality disorder.[5] [Tr. 337]. Vocationally, they predicted that

---

[5] Histrionic personality disorder is "marked by excessive emotionality and attention-seeking behavior; there is overconcern with physical attractiveness, sexual seductiveness, intolerance of delayed gratification, and rapid shifting and shallow expression of emotions." *Dorland's Illustrated Medical Dictionary* 1361 (29th ed. 2000).

> ability to sustain concentration and persistence may be limited at the present time in relation to maintaining schedules and attendance with her limitation related to symptoms of depression and adjustment to negative feelings as a result of her last job. . . . [S]he is likely to relate in an overly dramatic manner with others due to personality features. . . . [S]he may have some difficulty responding to change and dealing with stress.

[Tr. 337]. "Social interaction [did] not appear to be significantly limited." [Tr. 337].

Nonexamining Dr. James Walker produced a mental RFC assessment in May 1999. He predicted moderate limitation in seven areas, and a "marked" limitation in the ability to interact appropriately with the general public. [Tr. 346-47].

Clinical psychologist Steven Lawhon performed a consultative mental examination in February 2000. Plaintiff appeared mildly to moderately anxious and depressed. [Tr. 363]. She admitted consuming two to three drinks per day and "report[ed] a history of alcohol abuse." [Tr. 363]. Dr. Lawhon diagnosed depression, alcohol dependence, and panic disorder with agoraphobia. [Tr. 364].[6] He recommended substance abuse treatment. [Tr. 364]. Vocationally, Dr. Lawhon deemed plaintiff "limited" only in the ability to sustain concentration and persistence. [Tr. 366].

Although there are no supporting treatment notes in the administrative record, clinical psychologist Edward Latham counseled plaintiff ten times between September 1999 and May 2000. Dr. Latham reported a possible diagnosis of "Adjustment Disorder with Mixed Anxiety and Depression" and a "probably[] more accurate" diagnosis of "panic

---

[6] Agoraphobia is an "intense, irrational fear of open spaces[.]" *Dorland's Illustrated Medical Dictionary* 40 (29th ed. 2000).

7

disorder of moderate severity." [Tr. 325].

Nonexamining doctors Ed Sachs and R. Kourany generated mental RFC assessments in February and May 2000, respectively. Neither source predicted any functional limitation of more than a moderate degree. [Tr. 385-91].

### B. Physical

Dr. Michael Boggan performed a hernia repair in August 1996. Dr. Boggan noted an initial period of "poor wound healing" [Tr. 271] and performed a debridement in January 1997. [Tr. 276, 280]. By September 1997, however, he described the wound as almost "all healed." [Tr. 162].

Orthopaedist Howard Mize diagnosed carpal tunnel syndrome in 1994 [Tr. 189] and performed a carpal tunnel release in 1998. In August of that year, he described plaintiff as "doing satisfactory . . . . No complaints or problems. . . . Is doing well . . . ." [Tr. 187]. In March 1999, the state agency requested a medical/functional assessment from Dr. Mize. His response, in full, was, "This patient had carpal tunnel release in both wrist[s] but I have not placed any restrictions on her for this condition." [Tr. 186].

Dr. Wayne Page performed a consultative physical examination in May 1999. Plaintiff continued to report carpal tunnel difficulties and also "state[d] she is unable to work because, 'Unable to lift because of the hernia surgery. Can't stand long at a time.'" [Tr. 327, 329]. Plaintiff reported consuming two to three mixed drinks approximately four times per week and was "vague concerning her frequency of intoxication." [Tr. 329]. Testing for

8

carpal tunnel syndrome was negative, and grip strength testing was deemed invalid because plaintiff put forth "no effort." [Tr. 330-31]. Dr. Page noted mild abdominal tenderness. [Tr. 331]. Gait and range of motion were normal. [Tr. 331]. Dr. Page predicted that plaintiff could work at the light level of exertion without limitation. [Tr. 331].

Nonexamining physician Helena Perry generated a physical RFC assessment in June 1999. Dr. Perry predicted that plaintiff could lift at the light exertion level, and that she could both sit and stand/walk for about six hours each per workday. [Tr. 339]. Most postural activities, such as climbing and crouching, would be limited to an occasional basis, and plaintiff would be "limited" in bilaterally reaching above her head. [Tr. 340-41].

Dr. Karl Konrad performed a physical consultative examination in February 2000. Plaintiff again reported bilateral wrist pain worsened by writing or lifting. [Tr. 359]. She also continued to report abdominal pain "worsened with any type of lifting." [Tr. 359]. Plaintiff reported drinking two to four mixed drinks per day. [Tr. 359]. Carpal tunnel testing was again negative. [Tr. 361]. Dr. Konrad noted tenderness over the left groin area upon palpitation. [Tr. 361]. Based on his objective findings, Dr. Konrad predicted that plaintiff could work at the light exertion level without restriction. [Tr. 361].

Nonexamining physician Robin Richard generated a physical RFC assessment in February 2000. Dr. Richard predicted that plaintiff could lift at the light level, and that she could both sit and stand/walk for about six hours each per workday. [Tr. 369]. Limitations were predicted in gross and fine manipulation and in the climbing of ropes, ladders, and

9

scaffolds. [Tr. 370-71]. Nonexamining Dr. Reeta Misra produced a physical RFC assessment in June 2000. Dr. Misra's conclusions were the same as Dr. Richard's, except that limitation was predicted only as to gross manipulation. [Tr. 403-06].

## C. Post-Hearing Evidence

The Indian Path records from plaintiff's February 2001 hospitalization contain diagnoses of major recurrent depression and bipolar disorder (based on plaintiff's self-report). [Tr. 428, 449]. Plaintiff related her purported suicide attempt to the ALJ's denial of her benefits application. [Tr. 427].

## IV.

*Vocational Expert Testimony*

Vocational expert Cathy Sanders ("Ms. Sanders" or "VE") testified at plaintiff's administrative hearing. The ALJ presented a hypothetical claimant of plaintiff's age, education, and work background. The claimant would be limited to the light level of work and would be subject to the moderate nonexertional restrictions predicted by the May 2000 Mental RFC. [Tr. 62-63, 389]. In response, Ms. Sanders listed a significant number of jobs existing in the regional and national economies that the hypothetical claimant could perform. [Tr. 63]. The VE also identified a significant number of performable sedentary jobs existing both nationally and in the region. [Tr. 63-64].

If, in addition, the hypothetical claimant was seriously impaired in concentration, persistence, and dealing with work stresses, Ms. Sanders testified that all

employment would be precluded. [Tr. 64]. Similarly, if the hypothetical claimant were limited to the degree alleged in plaintiff's testimony, all employment would be precluded. [Tr. 64-65].

V.

*Applicable Legal Standards*

This court's review is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). Nonetheless, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490 (1951).

A claimant is entitled to disability insurance payments under the Social Security Act if she (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial

11

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A). Disability is evaluated pursuant to a five-step analysis summarized by the Sixth Circuit as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520). Claimants bear the burden of proof at the first four steps. *See Walters*, 127 F.3d at 529. The burden shifts to the Commissioner

at step five. *See id.*

VI.

*Analysis*

Plaintiff offers three discernible arguments in support of reversal or remand. The court will address these theories in turn after briefly discussing the pivotal issue of plaintiff's credibility.

A. Credibility

Near the end of his opinion, the ALJ "conclude[d] the claimant's allegations of disabling pain and other symptoms are not credible or supported by the documentary evidence." [Tr. 23]. Specifically, the ALJ accurately noted that

1. Dr. Lawhon's evaluation described plaintiff as "overly dramatic and manipulative on clinical examination" [Tr. 20];

2. Despite plaintiff's self-reports of disabling carpal tunnel symptoms, her treating orthopaedist opined that she would have no restrictions based on that historical condition [19, 22]; and

3. Dr. Page deemed his grip strength testing invalid because plaintiff put forth "no effort" [Tr. 22].

Cumulatively, these facts provide substantial evidence that plaintiff's self-reporting is less than reliable.

In addition, the court notes the record evidence pertaining to plaintiff's use of alcohol and opioids. To be certain, the issue of whether or not plaintiff has a substance abuse problem is not before this court. This evidence is instead cited for its relevance to plaintiff's

13

credibility. She admitted excessive alcohol and/or opioid use to four different medical sources [Tr. 329, 333, 359, 363-64], causing two sources to diagnose alcohol dependence and/or opioid abuse [Tr. 337, 364] and causing one to recommend substance abuse treatment [Tr. 364] as accurately noted by the ALJ. [Tr. 20].

At the administrative hearing, plaintiff acknowledged making these statements to the medical sources ("I was just being, like I say, honest" [Tr. 45]), but then tried to disavow them [Tr. 45-46]. That inconsistency further diminishes her credibility. More striking is the post-hearing evidence pertaining to the alleged 2001 suicide attempt. Although the record before the ALJ contained, among other things, plaintiff's own admission that "I drink till I'm out of it," in February 2001 she told the Indian Path staff that the ALJ "claimed that she was dependent on alcohol *and this was not true*." [Tr. 427] (emphasis added). The ALJ's decision, as cited and quoted above in footnote one, made no such finding. Instead, the ALJ merely (and accurately) summarized the objective evidence supplied by plaintiff's examining doctors.

Again, the issue of plaintiff's alcohol and drug usage is not before this court. Nothing in this court's ruling should be construed as definitively finding that plaintiff has a substance addiction problem. The evidence above is instead cited because it illustrates that plaintiff's self-reporting is far from reliable.

Certainly, the ALJ *could have* credited plaintiff's subjective complaints in this case. However, he could also have reasonably rejected them based on the present record.

The substantial evidence standard of review permits that "zone of choice." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Further,

> after listening to what [plaintiff] said on the witness stand, observing [her] demeanor, and evaluating that testimony in light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [plaintiff] was trying to make [her] symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment. It is a difficult job, and the people who perform it sometimes err. Such errors are obviously difficult for a reviewing court to detect (the reviewing court not having seen the claimant in the flesh), and we will not normally substitute our impressions on the veracity of a witness for those of the trier of fact. ***We would be particularly reluctant to do so in this case, where there seem to be demonstrable discrepancies between what the claimant said on the stand and what the written record shows***.

*Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) (emphasis added).

Where a record contains numerous discrepancies, it at some point becomes impossible for the fact-finder (be that the undersigned or an ALJ) to completely separate truth from fiction. The present plaintiff must accept that consequence as an outcome of her own conduct.

### B. Evidence Outside the Present Record

Plaintiff first argues that the Appeals Council erred in considering evidence outside the present record. In its November 2005 decision, the Appeals Council stated that it had "reviewed all of the evidence in *both* the current *and subsequent files* and finds no basis for changing the findings in the decision dated February 8, 2001." [Tr. 466] (emphasis added). However, the records pertaining to plaintiff's successful third application were not

15

made a part of the current administrative file. Plaintiff contends that because "the evidence from the subsequent file has not been made a part of the record for our review [or] the Court's review, it is impossible to determine if this determination is supported by substantial evidence."

The court finds no merit in this argument. Plaintiff and her experienced Social Security attorneys are wholly aware of which medical records were considered by the Appeals Council. [Doc. 21, ex. 2]. Plaintiff's present counsel were also her attorneys of record before the Appeals Council [Tr. 464, 471; doc. 21, ex. 1, 2] and they represented her in the successful third application. [Doc. 21, ex. 2]. Nonetheless, plaintiff has made no effort to identify any pertinent evidence that is not before this court and to then specifically explain how any such evidence would make a difference in the present case. This issue is therefore deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted).

## C. Use of Medical Advisor

Recapping her history of mental health complaints, evaluations, and treatment, plaintiff next argues "that she did not suddenly become disabled the day she entered the hospital [in February 2001 following the purported suicide attempt]." She thus contends that

16

the Commissioner erred by not utilizing medical advisor testimony to infer the onset date of her disability pursuant to Social Security Ruling 83-20.

This argument is unavailing. There is in this case an adequate medical record covering the relevant time period, and additional medical advisor testimony would thus be unnecessary to infer a date of onset. *See McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 836-37 (6th Cir. 2006) (no need for medical expert testimony where the "medical record was well developed and carefully reviewed by the ALJ."). The Commissioner therefore committed no error in not requiring medical advisor testimony.

### D. Nonexamining Physician Evidence

Lastly, plaintiff contends that the ALJ's physical RFC findings were not supported by substantial evidence. Specifically, plaintiff contends that the ALJ erred in neither: (1) adopting every limitation predicted by the nonexamining, file-reviewing physicians; nor (2) explaining why the limitations were not adopted.

As discussed above, nonexamining physician Perry predicted that most postural activities, such as climbing and crouching, would be limited to an occasional basis, and that plaintiff would be "limited" in bilaterally reaching above her head. [Tr. 340-41]. Nonexamining physician Richard predicted limitations in gross and fine manipulation and in the climbing of ropes, ladders, and scaffolds. [Tr. 370-71]. Nonexamining physician Misra predicted that plaintiff would be limited in gross manipulation. [Tr. 405]. None of these restrictions were made part of the hypotheticals presented to the VE.

17

The opinion of a nonexamining physician is generally entitled to little weight if contrary to the opinions of treating and examining sources. *See, e.g., Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *see also* 20 C.F.R. § 404.1527(d)(1)-(2), (f)(2)(ii). Nonetheless, the Commissioner's rulings mandate that ALJ's "may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96-6p, 1996 WL 374180. Although the present ALJ cited with approval the "light exertion" prediction of one nonexamining physician, he did not expressly address the various postural restrictions noted above. That failure was error, but because the court finds indirect support for the challenged rejection of the file reviewers' opinions, the error will be deemed harmless.

An administrative decision should generally not be reversed and remanded where doing so would be merely "an idle and useless formality." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citation omitted). At the same time, a reviewing court cannot find an error to be harmless solely because the claimant "appears to have had little chance of success on the merits anyway." *Id.* at 546 (citation omitted). Instead, the court must be able to discern at least *some* indirect support for the challenged rejection of a pertinent opinion, such as:

    1. The medical opinion was so patently deficient that no reasonable fact-finder could have credited it;

    2. The ALJ elsewhere adopted the opinion;

    3. An earlier decision by the ALJ adequately addressed the issue; or

    4. The ALJ's reasoning could be inferred from his overall discussion of the condition.

*Id.* at 547; *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462-67 (6th Cir. 2005).

    The nonexamining physicians related their predictions to carpal tunnel syndrome and hernia surgery. [Tr. 340, 370-71, 402]. As for carpal tunnel syndrome, however, the orthopaedist who treated that condition described plaintiff as "doing well" and did not "place[] any restrictions on her for this condition" [Tr. 186-87], as correctly noted by the ALJ. [Tr. 19, 22]. As for plaintiff's hernia surgery, the ALJ correctly noted that the objective record shows an eventual recovery, no significant clinical findings, and no need for additional surgery. [Tr. 20]. Also, as again noted by the ALJ, the two consulting physicians examined plaintiff and offered minimal findings and no restrictions pertaining to either condition. [Tr. 20]. Lastly, as further noted by the ALJ, neither of the consulting physicians imposed any restrictions at all, other than limiting plaintiff to light work. [Tr. 21-22].

    The opinions of nonexamining physicians are entitled to less weight than the opinions of examining or treating sources. *See* 20 C.F.R. § 404.1527(d)(1)-(2), (f). Further, "the opinions of State agency medical . . . consultants . . . can be given weight only insofar as they are supported by evidence in the case record[.]" SSR 96-6p, 1996 WL 374180. As

stated by the ALJ, plaintiff's extraordinary residual complaints regarding carpal tunnel syndrome and surgery complications "are not . . . supported by the documentary evidence." [Tr. 23].

For all the reasons noted, the ALJ's rationale (pertaining to the nonexamining physician opinions) can easily be inferred from his overall discussion of plaintiff's carpal tunnel and hernia conditions. The final decision of the Commissioner will accordingly be affirmed. An order consistent with this opinion will be entered.

ENTER:

s/ Leon Jordan
United States District Judge